UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES L. STEVENSON,<br><br>    Plaintiff,<br><br>    v.<br><br>M. JONES,<br><br>    Defendant. | Case No. 15-cv-05241-SI<br><br>**ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANT**<br><br>Re: Dkt. No. 23 |

# INTRODUCTION

Charles L. Stevenson, an inmate currently at the San Francisco County Jail, filed this *pro se* civil rights action under 42 U.S.C. § 1983. This action is now before the court for consideration of the motion for summary judgment filed by defendant and opposed by Stevenson For the reasons discussed below, summary judgment will be granted in defendant's favor.

# BACKGROUND

Stevenson alleges two claims in his amended complaint. First, he alleges that San Francisco Sheriff's Deputy Jones used excessive force on April 1, 2015, by handcuffing him too tightly. Second, he alleges that Deputy Jones violated his right to due process by causing him to be put in administrative segregation without a sufficient evidentiary basis for events on April 1, 2015.

The following facts are undisputed unless otherwise noted:

The events and omissions giving rise to this action occurred in April 2015, at the San Francisco County Jail # 5 in San Bruno, California. At the relevant time, Stevenson was housed in the jail as a pretrial detainee (although he has since had a trial and been convicted of a crime).

1   Since his arrival at the jail in September 2014, he had been classified as a maximum custody
2   inmate. Docket No. 23-1 (deposition of Charles Stevenson), Reporter's Transcript ("RT") 75.
3   (Because the Stevenson Deposition transcript is the only transcript in evidence, all references to
4   "RT" refer to pages in that transcript.) Also at the relevant time, M. Jones was a San Francisco
5   Sheriff's deputy stationed at the jail.

A.  Stevenson Is Handcuffed on April 1

Normally, an inmate is handcuffed with a single pair of handcuffs. According to Stevenson, two pairs of handcuffs -- also sometimes called double-cuffs -- are used for inmates with obesity and medical issues. RT 35. For double-cuffing, one cuff on one pair is attached to one wrist and a cuff on the other pair is attached to the other wrist, and then the other cuffs of the two pairs of handcuffs are attached to each other. RT 53. The wrists are about 12 inches apart when double-cuffs are used. RT 53-54; Docket No. 24 (Jones Decl.) at 2. "Deputies are trained to use one set of handcuffs for officer safety." Docket No. 24 at 2.

At the relevant time, Stevenson weighed about 275 pounds and was 5'11" tall. RT 35. According to Stevenson, he is normally double-cuffed when handcuffs are needed; other than on April 1, he has not been placed in single handcuffs since 2014. Docket No. 21 at 2, 4. Stevenson had a "low tier low bunk chrono [i.e., a medical authorization form] from medical based on documented compression fractures in [his] spine from 2011." Docket No. 21. He provides no evidence that Deputy Jones was aware of this chrono, and does not provide any evidence that he had a chrono for double-cuffs.

On April 1, Deputy Jones announced in Stevenson's housing unit that inmates in several cells would be moved and that the inmates had to gather their belongings to move. Deputy Jones came to Stevenson's cell and repeatedly ordered Stevenson to get dressed and cuff-up[1] in

---

[1] The parties' filings indicate that "cuff up" is jailspeak for an inmate to submit to handcuffing, usually by turning his back toward a guard and presenting his hands behind his back to be handcuffed behind his back.

2

preparation for the move. Docket No. 24 at 1-2.[2] Stevenson refused to get dressed or cuff-up; instead, he requested to speak to a supervisor. RT 16, 32; Docket No. 21 at 2 (Stevenson "requested a supervisor be present for the re-housing because [he] has witnessed Deputy Jones abuse his authority dealing with other prisoners"). Deputy Jones called for assistance. Sergeant Mallett, a supervisor, responded with several other deputies and Stevenson was put in double-cuffs without further ado. *Id.* at RT 16, 34-35.[3] Stevenson was placed in an interview room for about an hour and a half. *Id.* According to Stevenson, Deputy Jones did not take part in this initial handcuffing or moving him to the interview room in Pod 2B.

At some point, Stevenson was released from the handcuffs and was in an interview room.

Deputy Jones came to the interview room and told Stevenson to cuff-up. RT 16. Stevenson said to him, "Can I have two handcuffs because I can't put my arms together behind my back. Because I'm a big guy, and my shoulders are wide, and it's hard for me to close my hands." *Id.* at 16-17. Deputy Jones refused to double-cuff Stevenson, and "grabbed both [his] hands, slammed them together, and placed the cuffs on [Stevenson]." RT 17; Docket No. 21 at 3-4. When the handcuffs were put on him, Stevenson yelled but did not say they were too tight and did not ask for the handcuffs to be loosened. RT 40-41. Stevenson states that he did not want to say anything because he thought Deputy Jones had a bad attitude, and thought that saying something might have prompted Deputy Jones to inflict more pain in handling him. RT 40-41. There is no evidence that Stevenson revealed these thoughts to Deputy Jones.

---

[2] The parties disagree as to whether Stevenson was not wearing a shirt (in Stevenson's version) or was not wearing pants (in Jones' version), but the disagreement as to the particular article of clothing is immaterial. *Compare* RT 32-33 *with* Docket No. 24 at 1-2. Stevenson concedes he was supposed to have a shirt on when he left his cell and, in order to be ready to be moved, he needed to be fully clothed. RT 33. According to Stevenson, he did not put his shirt on when Deputy Jones initially told him to get ready to move and then refused to put it on after Jones had thrown it on the dirty floor. RT 32-33.

[3] The parties disagree as to whether Deputy Jones applied the handcuffs at this point or later in the day. Stevenson's evidence is that other deputies handcuffed him in front of Sergeant Mallett, and that Deputy Jones did not handcuff him until later that day and did so in an interview room. At the summary judgment stage, the court accepts Stevenson's version because he is the nonmovant.

Stevenson's wrists were bruised and cut from the handcuffing, and healed in a couple of days. RT 59-60. Stevenson also contends that his wrist was fractured, but provides no competent evidence in support of the contention and admits that no medical doctor ever made such a diagnosis.[4]

B. <u>Disciplinary Write-Ups</u>

Stevenson received three disciplinary write-ups from Deputy Jones within 24 hours of the April 1 incident. He also had received two other disciplinary write-ups in the recent past, which have some relevance to the issues here because new disciplinary periods were tacked onto the end of existing disciplinary periods -- somewhat in the nature of consecutive rather than concurrent sentences. The incident reports provide the following information about the several disciplinary write-ups:

● <u>March 6, 2015 narcotics/medications/weapons possession</u>: During a cell search on March 6, deputy Colmenero found "2 razor blades, 1 hand rolled cigarette of suspected marijuana, and 2 blue pills identified as Sertraline 50 mg." hidden in a jar with Stevenson's name on it. Docket No. 23-2 at 113-14. The discipline imposed was disciplinary isolation from March 7 to March 27, loss of commissary from March 7 to March 27, and loss of visits from March 7 to March 27. *Id.*

● <u>March 19, 2015 drug possession</u>: Deputy Rold searched Stevenson's cell on March 19, and "found two paper bindles. One had a white powder substance. One had a small blue pill. JMS identified the small blue pill as Sertraline, a pill which Stevenson is prescribed but does not have a self carry prescription for" and the white powder tested "positive for heroin." Docket No. 23-2 at 116-17. The discipline imposed was disciplinary isolation from March 27 to April 21, loss of recreation from March 27 to April 21, loss of commissary from April 1 to April

---

[4] Stevenson contends that the fracture had not been diagnosed because medical care was slow. He stated at his September 21, 2016 deposition that he had received an x-ray before that deposition. RT 24. Tellingly, when he filed his opposition to the motion for summary judgment several months later in February 2017, Stevenson did not submit an x-ray report or any other medical records showing that he had a wrist fracture.

4

19, and loss of visits from March 28 to April 21. *Id.* at 117.

- March 31, 2015 refusal to obey direct order: Deputy Jones wrote a disciplinary charge -- apparently called a request for discipline -- at about 6:00 p.m. on March 31, charging Stevenson with disobeying a direct order. The narrative for the offense stated that Stevenson "refuses to stop yelling out of his cell. I have given him several verbal warnings and opportunities to comply with my orders. [H]e refuses. Inmate is currently on lock up until 4/21." Docket No. 23-2 at 118. According to the incident report, Stevenson's explanation was that "he was yelling . . . because he wanted a grievance." *Id.* The discipline imposed was disciplinary isolation from April 21 to May 1, loss of commissary from April 19 to April 29, and loss of visits from April 21 to May 1. *Id.* Stevenson admits that he received notice and a hearing for this rule violation. RT 47.

- April 1, 2015 3:30 p.m. refusal to obey direct order: Deputy Jones wrote a disciplinary charge that Stevenson "has been loud and disruptive everyday for the past week. I have given him warning after warning and he still continues to disrupt the daily pod function. Today I ordered him to roll up to be re-housed, he refused. A supervisor had to respond before Stevenson would comply. Inmate says he is not a kid and does not have to listen to anything deputies say. Inmate is currently on lock up until 4/21." Docket No. 25-3 at 2-3. According to the incident report, "Stevenson claimed that the order for him to cuff up was never given to him by Deputy Jones. Stevenson [said] he was complying with Deputy Jones' order to re-house." *Id.* at 2. The discipline imposed was disciplinary isolation from May 1 to May 11, loss of commissary from April 29 to May 9, and loss of visits from May 1 to May 11. *Id.* at 2.

- April 1, 2015 5:30 p.m. "riot": Deputy Jones wrote a disciplinary charge stating: "As I attempted to move inmate to pod 2B, he refused to be handcuffed. He demanded for me to use two handcuffs while being transported. He refused at least 3 lawful orders to cuff up. I eventually placed a pair of handcuffs on inmate Stevenson without using two pairs. As I escorted him to pod 2B he said, 'I don't give a fuck.' Inmate continually has become disruptive to normal pod operations and was placed in ad-seg housing. He is currently on lock up." Docket No. 25-4 at 2-3. A comment in the discipline section stated that "Stevenson disrupted Pod 2A and incited

5

the other inmates with statements of non-compliance in which multiple deputies had to quell the disruption." *Id.* at 2. The discipline imposed was disciplinary isolation from May 11 to June 10, loss of commissary from May 9 to June 8, and loss of visits from May 11 to June 10. *Id.*

Deputy Jones had no involvement with the first two disciplinary matters. Deputy Jones wrote up the disciplinary charges for the last three matters, but did not adjudicate those charges.

Stevenson's own testimony at his deposition shows some basis for the disciplinary charges on April 1, even though he may have felt justified in his behavior. He stated he asked for a grievance 3-4 times, "yelled" for a grievance, and knocked on his door loudly. RT 26-29. When Deputy Jones "acted" like he did not hear Stevenson, Stevenson "made sure he heard me." RT 28. When Deputy Jones first came to his cell and asked him to cuff-up, Stevenson refused and said he would not cuff up until Deputy Jones called a supervisor. RT 32.

C. <u>Stevenson Is Moved To Pod 3B on April 1</u>

Deputies are allowed to move inmates for a variety of reasons, such as to maintain order and accommodate the needs of other inmates. Docket No. 24 at 3.

On April 1, Deputy Jones moved Stevenson from Pod 2A to Pod 3B. According to Deputy Jones, Stevenson was moved because he had been disruptive and not as a disciplinary measure. Docket No. 24 at 2-3. Stevenson was already on disciplinary lockup in Pod 2A due to the earlier disciplinary charges from March 6 and 19, and the administrative segregation placement did not alter the discipline that was already in place. *Id.* at 2-3.

An "administrative segregation record" memorialized Stevenson's placement in administrative segregation. The "administrative segregation record" states that at "1530 hrs." on April 1, Stevenson "was removed from general population and placed on administrative segregation status" because he was being "disruptive" in the general population. In the narrative section of the record, Jones wrote: "refused to be re-housed. Attempting to incite other inmates in pod against deputy. I/M has continually become a disruption to daily pod function." Docket No. 24-1 at 2. The form was signed by Deputy Jones as the "staff recommending placement" and by Sergeant Mallett as the "supervisor approving placement." *Id.* The form has a handwritten note

on it stating "removed/rehoused G.P. 7/20/15," which corresponds roughly with Stevenson's statement that he remained in administrative segregation for about three months. RT 46.

The "administrative segregation record" was a fill-in-the-blanks sort of form, with some preprinted information. Docket No. 24-1 at 2. The form had these boxes to be checked to show the reason(s) the inmate was being removed from general population and placed in administrative segregation:

> - ESCAPE - Prone to escape and/or history of escape
> - ASSAULTIVE - Prone to assault staff
> - ASSAULTIVE - Prone to assault other prisoners
> - DISRUPTIVE - In general population
> - GANG - Active participation in gang or other disruptive group activities while in custody
> - PROTECTION - Likely to need protection from other prisoners
> - DOCUMENTED THREAT - To the safety and security of the facility or to others
> - MEDICAL ISOLATION - Per request of Jail Health Services
> - OWN REQUEST - Requests ad seg housing because _____.
> - OTHER - _____.

*Id.* Under that list of reasons for placement, the form states: "Note: Administrative Segregation is an option afforded facility administrators for the maintenance of order, safety and security; it is not and must not be confused with punishment or discipline." *Id.*

Stevenson was moved to Pod 3B, which was an administrative segregation unit. The parties disagree whether Pod 3B was a *psychiatric* administrative segregation unit. Stevenson states that Pod 3B was psychiatric administrative segregation, whereas Deputy Jones states that it was not. *Compare* RT 23 *with* Docket No. 24 at 2. For purposes of the pending motion, the court accepts as true the nonmovant's version, i.e., the court accepts that Pod 3B was a psychiatric administrative segregation unit. There is no evidence that Pod 3B entailed significantly different conditions for Stevenson than he would have experienced in a nonpsychiatric administrative segregation unit. He states only that he "was in the pod with psychiatric access. So people were doing a lot of strange stuff." RT 92. Stevenson also declares that transportation (such as to court or visitation) and movement from the pod would be in leg irons and waist chains with cuffs, Docket No. 21 at 3, but presents no evidence that he went to court or had visits during his stay in administrative segregation. Stevenson was never put in a safety cell, RT 92, and there is no evidence that he received any psychiatric care or medications as a result of his placement in Pod

3B. In Pod 3B, he had phone calls, yard access every other day, and commissary privileges. RT 92. The phone calls, yard access and commissary available for Pod 3B inmates were less restrictive than in Pod 2A, where he had been housed previously in disciplinary isolation. *See* RT 89. There are television sets in Pod 3B, unlike in Pod 2A. Docket No. 24 at 2.[5]

## VENUE AND JURISDICTION

Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the events or omissions giving rise to the complaint occurred in San Mateo County, located in the Northern District. See 28 U.S.C. §§ 84, 1391(b). This Court has federal question jurisdiction over this action under 42 U.S.C. § 1983. See 28 U.S.C. § 1331.

## LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts

---

[5] Neither party states whether the discipline imposed on Stevenson due to the write-ups mentioned in the preceding section was lifted when he went to Pod 3B, or if the discipline was carried out in Pod 3B. The absence of this information does not affect the analysis because, if the discipline continued, that discipline was due to the disciplinary write-ups rather than the administrative segregation placement decision at issue in this case.

8

to the nonmoving party to "go beyond the pleadings and by [his or her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald,* 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, Stevenson's complaint (but not his amended complaint) was signed "under penalty of perjury" and therefore is considered as evidence for purposes of deciding the motion.

The court's function on a summary judgment motion is not to make credibility determinations nor to weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *Id*. at 631.

**DISCUSSION**

This is a case in which the doctrine of qualified immunity is rather important. As explained below, the defendant's actions did not violate the plaintiff's constitutional rights. But even if they did, the doctrine of qualified immunity protects him. The analysis thus begins with an overview of qualified immunity, followed by a consideration of the merits of each of plaintiff's claims and the application of qualified immunity to each of those claims.

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine of qualified immunity attempts to balance two important and

9

sometimes competing interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine thus intends to take into account the real-world demands on officials in order to allow them to act "swiftly and firmly" in situations where the rules governing their actions are often "voluminous, ambiguous, and contradictory." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) (citation omitted). "The purpose of this doctrine is to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Id.*

To determine whether a government official is entitled to qualified immunity, courts must consider (1) whether the official's conduct violated a constitutional right, and (2) whether that right was "clearly established" at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232. Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

"An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate." *City and County of San Francisco, Cal. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (alteration and omission in original; citation omitted). This is an "exacting standard" which "gives government officials breathing room to make reasonable but mistaken judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law." *Id.* (alteration in original; internal quotation marks omitted).

A. Excessive Force Claim

To prove an excessive force claim under § 1983, a pretrial detainee must show that the "force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). A court (judge or jury) cannot apply this standard mechanically. *Id.* Rather, "objective reasonableness turns on the 'facts and circumstances of each

10

particular case.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. *Kingsley*, 135 S. Ct. at 2473. A court "must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)) (alterations in original). "[O]verly tight handcuffing can constitute excessive force." *Wall v. Cnty. of Orange*, 364 F.3d 1107, 1112 (9th Cir. 2004).

Factors that may bear on the reasonableness of the force used include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 135 S. Ct. at 2473.

The parties appear to agree that county jail inmates regularly can be, and are, handcuffed when moved within the jail. The disagreement instead centers on whether Deputy Jones' refusal to use double-cuffs and insistence on using tight single-cuffs amounted to excessive force. Stevenson fails to present evidence that would allow a reasonable jury to conclude that it was excessive force.

Stevenson fails to show a triable issue of fact in support of his claim that Deputy Jones used excessive force when handcuffing him on April 1, 2015. The evidence shows that Stevenson always was double-cuffed by other staff at the jail, but there is no evidence he had a chrono requiring double-cuffing. The undisputed evidence shows that on April 1, Stevenson already was housed in disciplinary isolation and had been disruptive earlier that day, requiring that a supervisor be called because he did not want to be handcuffed by Deputy Jones. (Stevenson's dislike of Deputy Jones was based on Stevenson's perception that Jones was disrespectful to other inmates, and his demand for a supervisor apparently was not related to the single versus double handcuffing issue.) The undisputed evidence also shows that Deputy Jones refused Stevenson's request for

11

double-cuffs and instead used single-cuffs. The evidence further shows that the use of single-cuffs was consistent with the deputy's training, single-cuffs were the norm to promote officer safety, and double-cuffs allowed greater hand movement potential for the inmate. Stevenson's evidence shows that the single-cuffs were quite tight (so that they left bruises and a cut on one wrist that healed in a couple of days) yet, once handcuffed, Stevenson did not tell Deputy Jones that the handcuffs were too tight or ask Deputy Jones to loosen the handcuffs.

Although it is true that overly tight handcuffing can amount to excessive force, *see Wall*, 364 F.3d 1107, the level at which the fit becomes unconstitutionally tight is not well-defined. The several cases reviewed by this court in which a plaintiff managed to raise a triable issue of fact involved significantly more force than used in Stevenson's case, greater injuries to the hands, and/or refusals by officers to loosen handcuffs once alerted by the handcuffed person that the handcuffs were painfully tight. In *Wall*, the police officer (1) "grabbed him by his right wrist and bent and twisted his arm, causing pain," forced him face-first into a car and handcuffed him "'extremely tight;'" and (2) for at least 20 minutes, refused to loosen the handcuffs although twice asked to do so by the arrestee. 364 F.3d at 1109-10. A neurologist declared that plaintiff had suffered nerve damage from the incident and there was evidence that he was forced by the injury to give up his dentistry profession. *Id.* at 1110. This evidence, if believed, would show that the officer "used excessive force in making the arrest and continuing the restraint by handcuffs that hurt and damaged [the arrestee's] wrist." *Id.* at 1112. Similarly, in *LaLonde v. Cnty. of Riverside*, 204 F.3d 947 (9th Cir. 2000), the plaintiff's evidence showed significantly more force than was used on Stevenson plus a refusal to loosen the cuffs that was absent in Stevenson's case. In *LaLonde,* the plaintiff presented evidence that, after one officer knocked him to the floor and pepper-sprayed him, another officer caused significant pain by forcefully putting his knee into the plaintiff's back during the handcuffing at plaintiff's home; the officers then required him to sit handcuffed and with pepper-spray burning his face for about 20-30 minutes, during which time the officers refused to loosen the handcuffs despite the plaintiff telling them the pepper-spray was burning and the handcuffs were cutting off his circulation. *Id.* at 952. The *LaLonde* plaintiff also presented evidence of ongoing back and wrist pain from the incident. *Id.* at 953. The court held

that the district court was wrong to grant judgment as a matter of law on the qualified immunity defense, *id.* at 959.[6] *See also Meredith v. Erath*, 342 F.3d 1057, 1060, 1061 (9th Cir. 2003) (reversing summary judgment because a reasonable jury could find excessive force where officer grabbed by the arm a woman detained during execution of a search warrant, forcibly threw her to the floor, handcuffed her while twisting her arms, and did not respond for 30 minutes to her complaints that the handcuffs were too tight and causing pain); *Alexander v. County of Los Angeles*, 64 F.3d 1315, 1322-23 (9th Cir. 1995) (although it was "close," it could not be said as a matter of law that the officers' use of force was reasonable where (1) robbery suspect was handcuffed and forced to remain handcuffed for 45-60 minutes, after being slammed into a car, carried and pushed into the back of a police car with his hands behind his back; (2) officers waited 35-40 minutes before adjusting handcuffs after detainee said he was a dialysis patient and complained about the handcuffs; and (3) detainee's hand was still swollen and numb nine months after the incident); *Palmer v. Sanderson*, 9 F.3d 1433, 1434-35 (9th Cir. 1993) (district court properly denied qualified immunity on excessive force claim where officer allegedly yanked out of a car 67-year-old Palmer who had mobility issues due to a recent stroke, "handcuffed him, and pushed him into the back seat of the patrol car with such force that Palmer fell over sideways. Palmer claims that the handcuffs were tight enough to cause pain and discoloration to his wrists [with bruises lasting for several weeks], and that [officer] refused his request to loosen them.").

In contrast to these cases, Stevenson's evidence does not establish or show a genuine issue of fact in support of his claim that Deputy Jones used excessive force on him. On the evidence in the record, no reasonable jury could find that the force involved in Deputy Jones' tight application of single-cuffs to Stevenson was an objectively unreasonable use of force. Deputy Jones is entitled to summary judgment on the merits of Stevenson's claim.

Deputy Jones also is entitled to qualified immunity because his conduct did not violate a constitutional right. Moreover, even if there was a triable issue as to whether the force he used

---

[6] *LaLonde* applied a standard for qualified immunity later rejected by the Supreme Court in *Saucier v. Katz*, which held that the inquiry for qualified immunity is distinct from the inquiry on the merits of the excessive force claim. *See Saucier v. Katz*, 533 U.S. 194, 203 (2001), *overruled on other grounds in Pearson v. Callahan*, 555 U.S. 223 (2009).

13

was excessive, Deputy Jones is entitled to qualified immunity because it cannot be said "that any reasonable official in his shoes would have understood that he was violating" Stevenson's due process right to be free from excessive force. *Sheehan*, 135 S. Ct. at 1774. At the time Deputy Jones refused the double-cuffs and used the tight single-cuffs, there was no chrono requiring double-cuffs for Stevenson, Stevenson did not complain the cuffs were too tight or request they be loosened, Stevenson had refused Deputy Jones' orders to cuff-up earlier that day, and deputies had been trained to use single-cuffs for officer-safety reasons. As of April 2015, the Ninth Circuit had held that tight handcuffs could amount to excessive force, but no specific rule had been articulated as to what amount of tightness makes handcuffs too tight, and the facts of the Ninth Circuit's cases suggested that too-tight handcuffing usually involved significant injury to the hand and/or a refusal to loosen the handcuffs once the cuffed person complained of the tightness. Given these circumstances, Deputy Jones could have believed reasonably, but mistakenly, that the force he used did not amount to constitutionally-prohibited excessive force. He therefore is entitled to judgment as a matter of law in his favor on the defense of qualified immunity.

B. Due Process Claim

The Due Process Clause of the Fourteenth Amendment of the United States Constitution protects individuals against governmental deprivations of life, liberty or property without due process of law. When a pretrial detainee challenges conditions of his confinement, "the proper inquiry is whether those conditions amount to punishment," because the Due Process Clause does not permit punishment "prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). Disciplinary segregation as punishment for violation of jail rules and regulations cannot be imposed without due process, i.e., without complying with the procedural requirements of *Wolff v. McDonnell*, 418 U.S. 539 (1974). *See Mitchell v. Dupnik*, 75 F.3d 517, 523-26 (9th Cir. 1996).[7]

---

[7] The procedural protections required by *Wolff* in a disciplinary proceeding include written notice, time to prepare for the hearing, a written statement of decision, allowance of witnesses and documentary evidence when not unduly hazardous, and aid to the accused where the inmate is illiterate or the issues are complex. *Wolff*, 418 U.S. at 564-67. There also must be some evidence

14

Not every inconvenience, restriction, disability or other unfavorable condition that occurs "during pretrial detention amounts to 'punishment' in the constitutional sense." *Bell*, 441 U.S. at 537. To determine whether a condition imposed on a pretrial detainee amounts to such punishment, the court looks to whether the condition is "imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id*. at 538. Absent a showing of an "'expressed intent to punish'" by the jailers, whether a restriction amounts to punishment generally turns on whether there is an alternative purpose to which the condition rationally may be connected, and whether the restriction then appears excessive in relation to that purpose. *Id*. "[I]f a restriction or condition is not reasonably related to a legitimate goal--if it is arbitrary or purposeless--a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id.* at 539. It is not necessary that the condition be limited to ensuring that the detainee shows up at trial, as it is recognized that the government has "legitimate interests that stem from its need to manage the facility in which the individual is detained." *Id.* at 540. For example, jailers "must be able to take steps to maintain security and order" at the jail, so restraints that are reasonably related to these goals are not, without more, unconstitutional punishment. *Id.* Courts also must allow for the fact that considerations of jail security and order "'are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.'" *Id.* at 540 n.23 (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)); *accord Florence v. Bd. of Chosen Freeholders of County of Burlington*, 566 U.S. 318, 328 (2012).

Deputy Jones has met his summary judgment burden of presenting evidence that he did not place Stevenson in administrative segregation to punish him and instead did so to maintain order in the jail's general population because Stevenson was disrupting the orderly operation of the

---

to support the disciplinary decision, *see Superintendent v. Hill*, 472 U.S. 445, 454 (1985), and the information that forms the basis for the disciplinary action must have some indicia of reliability. *See Cato v. Rushen*, 824 F.2d 703, 704-05 (9th Cir. 1987).

15

housing unit. It is undisputed that deputies are permitted to move inmates at County Jail # 5 for administrative reasons, such as maintaining order and accommodating needs of other inmates. It also is undisputed that Deputy Jones believed that Stevenson was disrupting daily pod function and attempting to incite other inmates against Deputy Jones. At the beginning of the day on April 1, Stevenson was already on disciplinary isolation for two contraband-possession events in March, and had a disciplinary charge from March 31 pending against him for refusing to obey a direct order. On April 1, Stevenson disrupted efforts to rehouse him and other inmates: he failed to cuff up and get dressed as ordered so that he could be moved, insisted that he wouldn't cuff up and get dressed until a supervisor was called, and was making a lot of noise (although Stevenson states that he was shouting and banging on the door because he wanted a grievance form).

Stevenson urges that it was wrong to put him in administrative segregation on April 1, before the disciplinary charges against him were adjudicated on April 2 and 3, but this argument conflates his placement in administrative segregation with the disciplinary proceedings against him. The disciplinary proceedings were separate from the administrative segregation decision, even though they occurred close in time. First, the disciplinary write-ups show that they were charged, investigated, and adjudicated separately from the administrative segregation decision, and resulted in discrete forms of discipline (i.e., a specific number of days of disciplinary isolation and loss of identified privileges were imposed for each disciplinary offense). The administrative segregation placement was not tied to those disciplinary periods and actually lasted much longer than the disciplinary periods. Second, a preprinted part of the administrative segregation record form specifically noted that administrative segregation placement was not to be confused with punishment or discipline. That preprinted form also listed many possible reasons for which an inmate could be put in administrative segregation and the range of reasons (including medical needs and self-protection) shows that administrative segregation did not equal discipline. The reasons listed on the form, including disruption of jail operations, track the permissible reasons listed in the regulation for administrative segregation in local facilities. *See* 15 Cal. Code Regs. § 1053. Third, the conditions in administrative segregation were, in many respects, more agreeable than the conditions in the disciplinary isolation housing from where he had come: in the

16

1  administrative segregation unit, there was telephone access, yard access, commissary availability,
2  and television sets. There were things that were worse in administrative segregation: inmates were
3  transported and moved in leg irons and waist chains, although he presents no evidence that he
4  actually was ever placed in leg irons or waist chains during his stay in administrative segregation
5  and states that double-cuffs were used on him when he was moved while in Pod 3B. Docket No.
6  21 at 2.

7  The parties dispute whether the administrative segregation unit was a psychiatric administrative segregation unit. That dispute gives the court pause, but ultimately does not show a triable issue of fact. The reason a "psychiatric" administrative segregation unit gives the court pause is that the Supreme Court has identified the transfer to a mental hospital and the involuntary administration of psychotropic drugs as events so significant that they implicate the Due Process Clause itself, whether or not they are authorized by state law. *See Sandin v. Conner*, 515 U.S. 472, 484 (1995) (citing *Vitek v. Jones*, 445 U.S. 480, 493 (1980) (transfer to mental hospital), and *Washington v. Harper*, 494 U.S. 210, 221-22 (1990) (involuntary administration of psychotropic drugs)). Here, however, Stevenson does little more than label the unit as a "psychiatric" administrative segregation unit. He does not identify any particular negative attributes of this place beyond that people were doing "strange" things. He does not present any evidence that he was placed in a safety cell, given psychiatric care, or given psychiatric medications while in that unit. The conditions Stevenson describes come nowhere near to the involuntary administration of anti-psychotics in *Washington v. Harper*, 494 U.S. at 221-22, or the involuntary transfer to a mental hospital where the inmate was "subject[ed] involuntarily to institutional care" in *Vitek*, 445 U.S. at 493, that gave rise to the need for separate procedural due process protections in those situations. In essence, Stevenson's evidence shows only that he was in a pod in which some fellow inmates may have engaged in "strange" behavior as manifestations of their mental illness, but that does not support an inference that his placement in that pod was punishment.

Stevenson also argues that he was not being disruptive, but he fails to show a genuine dispute of fact on this point because he testified in his deposition to conduct that reasonably could be interpreted as disruptive. When Deputy Jones was trying to move Stevenson and other inmates,

17

Stevenson repeatedly asked for a grievance form, banged on his door, refused to cuff up for Deputy Jones, refused to get dressed, and instead asked to speak to a supervisor. *See* RT 26-34. When told to prepare to move, he testified he was the "first one ready to go," except that he really wasn't because he was not fully clothed and had not put all his papers from his desk into his box. RT 26, 29, 33. Additionally, Stevenson does not dispute that Deputy Jones had written a disciplinary charge the day before (i.e., March 31) because Stevenson "refuses to stop yelling out of his cell." Stevenson certainly had a right to request a grievance form, but the right to request the form did not include a right to act out and not comply with orders until his request was fulfilled.

Deputy Jones is entitled to qualified immunity because his conduct did not violate Stevenson's right to due process. Moreover, even if there was a triable issue as to whether the placement of Stevenson in the administrative segregation unit violated his right to due process, Deputy Jones is entitled to qualified immunity because it cannot be said "that any reasonable official in his shoes would have understood that he was violating" Stevenson's due process right in placing him there. *Sheehan*, 135 S. Ct. at 1774. Deputy Jones could have believed, mistakenly, but reasonably, that he could place the inmate in the administrative segregation unit to maintain order in the jail based on his perception that Stevenson had a disruptive influence on the other inmates in his housing unit. Deputy Jones therefore is entitled to judgment as a matter of law in his favor on the defense of qualified immunity.

Finally, the amended complaint lists only Deputy Jones as a defendant and contains allegations against only Deputy Jones, but Stevenson argues wrongdoing by Sergeant Mallett in his opposition to the motion for summary judgment. The scope of the action is defined by the operative pleading, which in this case is the amended complaint. The court will not grant leave to amend for Stevenson to further amend to plead a new claim against a new defendant at this late date because it would be futile. Stevenson's contention against Sergeant Mallett appears to be that it was improper for Sergeant Mallett to have been the decisionmaker on the disciplinary charges under jail regulations. This contention would not state a claim for a due process violation because, although there may be a jail regulation against an involved officer adjudicating a request for

discipline, the federal procedural protections required by *Wolff* do not impose such a limitation. *See* fn. 1, *supra*. The Due Process Clause only requires that inmates be afforded those procedures mandated by *Wolff* and its progeny; it does not require that a prison or jail comply with its own, more generous procedures. *See Walker v. Sumner*, 14 F.3d 1415, 1419-20 (9th Cir. 1994), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). *Wolff* does not disqualify a jail official from adjudicating discipline merely because he was present after the inmate refused to comply with orders from a deputy.

## CONCLUSION

Defendant's motion for summary judgment is GRANTED. (Docket No. 23.) Defendant is entitled to judgment as a matter of law on plaintiff's claims and on his defense of qualified immunity. The clerk shall close the file.

**IT IS SO ORDERED**.

Dated: May 30, 2017

_____
SUSAN ILLSTON
United States District Judge